And we will hear the next case for argument, which is Mosavi v. Mt. San Antonio College. My name is Shanta Driver, and I have the privilege to be arguing for Aarefah Mosavi, the appellant in this case. This case, to me, is a no-brainer. I think that any looking at the evidence in this case would suggest that, first and most importantly, that the action that Aarefah Mosavi brought against Mt. San Antonio College was something that needed to go before a jury, and in which there were multiple factual disputes that a jury should have had the opportunity to decide. Can I ask you about that? One of the issues did go to the jury, the claim against Brown, and there was a full defense verdict there. Is there any way, in light of that full defense verdict, that we could reverse any of the prior decisions? I think that you could, because I think it's really two separate... How could there have been deliberate indifference on part of the college in any event? Because I think that the question around the college is, was it using a standard of law at the time that it did the investigation that allowed for Ms. Mosavi to have a fair and full opportunity to present her case? Aarefah Mosavi, at Mt. SAC University, a college of 50,000 students, year after year after year, no sexual assault, no sexual assault. Aarefah Mosavi was completely distinguished by the fact that she went to the Mt. SAC administration, that she said what happened, and what she said and what then Chester Brown said happened were, according to the EEOC person, almost identical. You do an investigation of a student, you find that the male student says that he grabbed and hugged a woman who he had already established had not consented to that, that bear hug, that complete restraint of her in an area that was absolutely deserted at night, and then he says while he's got her in the bear hug and other parts of his testimony, that he had a little wiggle with her as his arms went down her back towards her waist. That's a sexual assault. That's what that is. As I understand it, the investigation didn't disagree with that. That sexual assault, you're saying it's a sexual assault as opposed to sexual harassment or something to that effect. In other words, it may well be a problem under Title IX, I don't know if it's a sexual assault, but whatever it is, they investigated that, if we're just talking about that and not anything further, and they took some steps to see that they did not encounter each other and it wasn't repeated, so what were they supposed to do? I think they could have held a trial. And then what? And they would have found this happened, and then what? And then they could take action against Chester Brown because what he did to her was unacceptable, and that has been clear in the law since 2011. There's been a whole movement and a movement in the law and a movement in the understanding of the law that college administrations have got to provide some protection for their young women. But taking action, in other words, is the problem that aside further than trying to tell them to stay away from her and not go to the same meetings and so on, that that was insufficient, they had to do something else to him? Before making a decision, I think they had to have an opportunity for the two people who were presenting this somewhat distinctly different. But I thought as to that particular issue, as opposed to the issues that went to trial as to whether he went further and grubbed her and so on, but as to that bear hug issue itself, they did find it happened, they didn't say it didn't happen. They just didn't find it actionable, and it obviously is. But what difference would it have made? In other words, they found it happened, they took steps to separate them, it never happened again, there was nothing pervasive or continuing about it. What was deliberately indifferent about what they did with her? I mean, I agree with you that that action itself was a problem, and that there were somehow not, the college didn't announce that that itself was a problem. But aside from announcing that it was a problem, what could they have done, or what didn't they do that made them deliberately indifferent? I think they could have given Chester Brown instructions that he needed to work somewhere else on the campus, that he needed to be hundreds of feet away from her, that they should never have had any contact after that, that she shouldn't have been in a position of having to run into him. They could have taken those modest steps, and here's the part that's so important, the failure of that administration to defend Aretha Massavi left her traumatized in all of these cases. They have a due process duty to both parties, and so you can't just say that any female who comes in and makes a claim, we're going to just believe her at the exclusion of doing a full investigation, and it looks like they did a full investigation. What is it that you wanted them to do that they didn't do here, other than perhaps interview the sister, is that right? That's right, there were some witnesses that should have been interviewed. Other than her, are there any others? There is Daniel Luna, who is another person who Ms. Massavi might be able to testify. I thought they did talk to you. They didn't talk to him prior to making any decisions. Right, they talked to him later, and they said it wouldn't have made any difference. Correct. It's also never been stated why he was relevant. The sister, we understand why she was relevant. She said she had some experience herself with Mr. Brown, but I couldn't understand why Mr. Luna was relevant. I think because he knew both of the two parties. He worked with them. But he wasn't there. I mean, he wasn't around. He wasn't around, but they have testimony from people who weren't around for the incident, including several of the administrators who say, oh, Chester was a hugger. He hugged up people all the time at work. Why wasn't he instructed to stop that? The answer that we got to that from the administration. Well, hold on, back up. Are you suggesting that colleges need to have a no-hugging policy straight across the board? Is that really where we've come to? Judge, I think that if you have somebody who is working for you. Is there any other complaint against him other than this complaint? Are you aware of any other on campus? He is a hugger. Has any other female stepped forward and complained? No, but I don't think that's surprising, Judge. And I think if the women who would step forward faced what Arifa Mousavi faced, they wouldn't have stepped forward. That's been the whole debate around sexual assault and sexual harassment and what situation. Listen, this wasn't sexual assault. A jury found it was not sexual assault. It was a jury finding. So I'm not sure what you want us to do here, and I'm not sure what you want the college to do. Because they looked at this, but to come in here and continue to claim these things when you've had your jury trial, you've lost the jury trial. I don't know what you'll, I mean, I just don't know where the claim is at this point. All right. Let me just ask you one question. Are you contending that there was evidence that was discovered during discovery in the district court proceedings that the college should have found and that would have made a difference? Because the standard is pretty high that in order to find them liable, there has to be deliberate indifference. So is there something that came out later that would have changed it, in your view, if they had found it? No, but I think they prevented themselves from finding it, you know, for two reasons. I mean, one, Lorraine Jones says that in her investigation she wanted to take Arifa back to the site, that she's the administrator that is responsible for doing this investigation. And she says she knows something has happened to Arifa. She is somebody who is an expert on trauma victims. That's what she did before she did this job. And she knows that it's absolutely going to be the case that trauma victims are going to say more, remember more, you know, and that as they become more able to feel like there might be some remedy to what's happened to them. So you're concerned about the effect of this on your client? I am. Yeah, we understand. And just on, Judge, on the question of accepting the jury verdict, we don't accept that jury verdict. You don't, you say? No. And because of the evidentiary errors? Correct. So explain to me why the evidentiary errors, or apparently the bias of the judge, explain to me why that would support us reversing the jury verdict. I mean, I think starting from the standpoint that Ms. Massavi and her witnesses could not use the term rape, that it could never be used in the case, and that the judge claimed was because there was, there'd be confusion on the part of the layperson, we don't think that there would have been. That's what's created these new laws, is laypeople demanding that the California State Legislature and that the United States Congress take action, take action to, you know, to meet the needs of women and define the issue of what is rape to be more expansive and inclusive and to be about, you know, lack of consent. So I think that that's one. I think that it was clear through the trial that the judge was oppositional to Ms. Massavi. When she was trying to testify and just describe what happened to her, she's somebody who's a very precise person, and she would use a term that, you know, maybe a jury wouldn't know, but she wasn't, she could have been asked to explain the term, but she, to shut her up, to tell her that she could say she had an anal fistula or that she was having these hallucinatory nightmares on a regular basis and say, no, you can't say that like you're not a doctor. Are you kidding me? I mean, she had to be able to testify freely, and I think when a jury sees it. So you think she wasn't allowed to testify freely. He shut her off in certain circumstances. Yes, she shut her off in certain circumstances, yeah. And I think that that was conveyed to the jury. I think the fact that Lorraine Jones, the administrator at the college, was allowed to testify without any counter-testimony allowed by Ms. Massavi on the biases that were in that investigation. But she did do a thorough cross-examination of Ms. Jones, including bringing out concerns about the investigation, didn't she? I think that in terms of what was conveyed. Yes, I think that's the most troublesome part of this, but although there was a motion in Limine saying that you couldn't attack the investigation as it turned out, in terms of the cross-examination, you largely did. Yeah, but the opposition, Chester Brown's lawyer, was able to say in his closing argument that these different authorities, including... I'm sorry, that what? That several different authorities, including the Mt. SAC administration, had found Chester Brown... He could say it, but you attempted to impugn it. Right, but I think from the standpoint of a jury, if you have somebody that has an official capacity, they have a status which gives what they... But did you object to her testifying, or did you attempt to yourself attack the investigation? To her testifying. And there was an objection to her testifying? Yeah, because if she was going to testify, then the only way to determine whether or not that testimony was something that was going to be more probative than prejudicial, it was necessary to go into the background on which... But that's what I'm saying. My understanding is that your concern was not with whether she could testify, but whether you could attack the investigation because she was testifying. Is that wrong? Did you object to her testifying at all? Okay, I think she should... If she was going... Yes, we objected to her testifying, or we are objecting to her testifying at all. That's number one thing. I think very similarly, in terms of the use of the text messages, once it goes in that you can use the text message to impugn a witness, then the text messages should go in. There should be an opportunity for the jury to have been able to put into context what Mr. Brown and Ms. Massavi were saying to each other, what their relationship was, and what happens that changes once Arifa Massavi makes clear to Chester Brown that his unwanted action was something that she wanted to stop. She wanted nothing more to do with him. And those text messages went in. The whole transcript of them was not provided to the jury. Okay, thank you. You have exceeded your time, but we will give you a minute on rebuttal. We need to hear from your adversary. Thank you. Thank you. Good morning, Your Honor. Jill Williams on behalf of appellee Chester Brown. You'll have to keep your voice up because we're scattered. Thank you, Your Honors. I represent Chester Brown, and my argument is going to be focused on the fairness of the trial issues that were raised, and Ms. Chung represents the college district and those employees and will address those issues. And how are you dividing your time? Can you give us an idea? Evenly. All right. You'll have to keep track of it. Yes. The entire argument about the fairness of the trial demonstrates that the appellant was attempting to rely on passion and inflaming the jury in lieu of evidence to support her case. Few of her arguments address the actual evidence that was presented. But was she stopped from testifying? Was the plaintiff stopped in testifying in certain circumstances? The two examples that counsel just gave about Ms. Massavi being prevented from testifying was with respect to issues concerning her damages that she was claiming, and it was specifically with respect to diagnoses of medical injuries that she had. So the court allowed her to describe what she was suffering from but did not allow her to ascribe a diagnosis to that because Ms. Massavi had not designated any experts to testify with respect to that. Ms. Massavi is obviously not a medical expert, nor is she qualified to testify with respect to that. So those were the instances that were just cited about her being prevented from testifying. But when it came to the evidence of what actually occurred between her and Chester Brown, Ms. Massavi was given complete latitude to describe everything and to put on evidence about everything. What about the testimony of Ms. Jones? I gather that there was an objection to her testifying at all, is that right? Correct. And what was she testifying to? What was the reason why she was allowed to testify? Her conclusion presumably is not pertinent and could be prejudicial. Was she allowed to testify about what the result of the investigation was? No. But she did state it at one point, as I recall. When Appellants Council objected to testimony about the conclusion, the court sustained those objections. The court also sustained the objections to the exhibits that were offered into evidence, which were letters identifying what the findings of the investigation had been. So those didn't come in? Those did not. What Ms. Jones was offered by Mr. Brown to testify concerning was with respect to how Ms. Massavi's story about what occurred on the night of the incident changed over time. So Ms. Jones testified that, well, when she very first received information from Ms. Massavi about the incident, Ms. Massavi said one thing. When she spoke with her again, she said another thing. And that was the purpose of bringing Ms. Jones in to testify, was to show that at various times, Ms. Massavi was giving an evolving and shifting story that was increasingly of more and more egregious conduct on behalf of Mr. Brown. Was Ms. Massavi allowed to respond after that testimony, or did she testify before that? She would have testified before that. She did, and the plaintiff did not put any evidence on as far as a rebuttal case. As the court noted, the plaintiff had every opportunity to thoroughly cross-examine Ms. Jones as to what she did and didn't do during the investigation. But as far as argument concerning that the investigation was inadequate, the court had excluded that. So if we determine that the trial can't be overturned, it is a pretty deferential standard to the district court and the jury in these circumstances, but if we were to find that the jury trial can't be overturned, if, I don't know, is there any basis that we would be able to go back on the summary judgment and bring any of the other parties in, or does that end it? Because if we effectively find there was no assault, could there have still been a violation on the front end of the investigation? So I'm asking the wrong attorney. I apologize. I don't believe so. I think Ms. Jones had an issue. Fair enough. Fair enough. Okay. But just to clarify, to get somewhere near Judge Nelson's point, the trial was based on an assault. Is that right? And the bear hug itself was not the subject of the trial. Is that accurate? Not entirely, Your Honor. The claims that went to trial was a Bain Act claim that he had acted towards her and violated her right to bodily integrity. There was a Ralph Act claim that he had acted violently towards her. There was a sexual battery claim, and then there was a religious harassment claim as well. What was the last one? I'm sorry. Religious harassment under the Bain Act as well. Okay. So then, was the jury's finding, in your understanding, that the bear hug incident itself was not, well, there's no doubt that it happened, that it wasn't actionable? Yes, Your Honor. And the first issue on the Bain Act was her right to bodily integrity, and the jury found that he did not violate that. And there are, as I understand it, there are no objections to the instructions. Correct. The jury instructions were agreed upon by the parties. And unless the court has any more questions with respect to the trial, I will leave the rest of the time for Ms. Chung. Thank you. Thank you, Your Honors. Alice Chung on behalf of San Antonio Community College. Ms. Jones, Ms. Smith, Dr. Scroggins, and Mr. Chaya. And I just wanted to address some of the arguments that Appelli had brought up. One of the things is that she believes that we should have brought on a trial of the issues. She's relying, if I'm correct, and she's relying on the reply, the case of Dovi Alley. That case is- Well, I understand that doesn't apply. But what happened here essentially was that the college said, well, we talked to both of them and they had opposing stories, and that's it, we can't do anything. Is that sufficient under Title IX to just throw up your hands and say that because she accused somebody of doing something and he denied it, that's the end of the story? Why don't they- Because despite all her changing of her story, they didn't say they weren't believing her. They just said, we can't resolve this, the end. Isn't that as accurate? Well, in the end, they did say that they did not have enough to substantiate Ms. Mozavi's allegations. They interviewed her multiple times. It's not just that they interviewed her one time or Mr. Brown one time. They met with her multiple times, met with Mr. Brown at least once or twice. They forwarded the investigation over to public safety when she was dissatisfied with the way that the investigation was going. And public safety eventually forwarded the investigation as well to- But essentially, in a he say, she say situation, you're never going to be able to have anything other than he said and she said. Ordinarily, I mean, maybe you have some physical evidence. But obviously, if they thought there was anything in it and they were going to take any actions against Mr. Brown, he should have had due process rights and that's sort of the dough issue. The question is whether it is sufficient under Title IX to simply say, well, if you have two people who are together in an isolated place and they have opposite stories, that's it. You can't do anything. Well, I think Ms. Jones also inquired about whether or not there was physical evidence of the assault, whether there were any text messages, any documentation. She inquired about all of those things. Unfortunately- Did she look at the text? Did the school look at the text messages as part of the investigation? They did, Your Honor. They asked for Ms. Mazzotti's phone. She provided it. I believe at some point they needed the charger. They reviewed it. It was part of the investigation as well. Asked her if she had any messages, anything else, any sort of witnesses. Unfortunately, because it had occurred at the farm at night where no one else was around at the time, there were no corroborating witnesses and there was no additional, I guess, evidence, unfortunately, to support Ms. Mazzotti's claim due to Mr. Brown's due process rights. Unfortunately, they were unable to substantiate those investigations. Why didn't they interview the sister? I think that there was a little bit of movement in terms of interviewing the sister, but they actually never did. That is true. Why didn't they? I think they looked into it. However, there was some sort of decision not to, but they were not looking at character. They believe that the character evidence, because she wasn't there, I think ultimately it came down to was she there at the time. Well, but she had something that was at least somewhat probative to some of the issues being raised, at least what potential motivations might have been behind it, whether he had made inappropriate comments in other contexts. Certainly, and then they did ask Mr. Brown about those allegations regarding the sister in the investigation. They just did not interview the sister. Well, but that, I mean, it does suggest that they, it's interesting that they went to another witness that wasn't even available and interviewed that witness after the fact who seemed to have less probative value to the investigation, but here's the sister. I mean, there was nothing. She wasn't out of town. She wasn't unavailable, right? I'm not sure if she, she might have been in college at Berkeley at the time, but I'm not entirely sure. I'm not going to say that's in the record. Go ahead. Oh, I was going to say that. Finish. The record shows that Ms. Mazzotti was very insistent that Mr. Luna be investigated and they did take those efforts to try to investigate him. I'm sorry, interview him. So, the other part of this that I did find mildly disturbing was that the college did seem to take the view that the so-called bear hug itself was not a problem. I mean, it was not any kind of sexual harassment that Title IX was concerned about. Is that accurate? I think that Mr. Brown did admit to the bear hug, but I believe that he did not describe it as forced. She might have expressed them otherwise. Well, but what does forced mean? What exactly was the evidence? I thought it was something like this. He said something like, he asked her to take the hijab off. She said no. She said, I want to go back. He said, not until I have a hug. She said what? I think she said no at that point, or maybe she didn't say anything, but he knew she was annoyed by it. She didn't say yes, and he knew she was annoyed by it. I think she was annoyed after the fact, or that's the expression. That's what was reported to the district. But the interesting point now is that they didn't get into that at all. They didn't think that was an issue, as I understand it. They concentrated entirely on the question of whether something more happened. But if just that happened, and she had affirmatively said that she didn't want the hug, and he didn't force her, but he did the hug, and knowing in some respect that she didn't want it and that she was annoyed afterwards, it may seem it only happened once and so on, but they did seem supremely unconcerned with that. I think they were focused on the allegations of the assault. Well, but that sort of goes to my question, and I don't mean to, if there's more you need to answer to Judge Breslin. I was just only going to add that the hug, whether unwelcome or not, we disagree it was forced or not. It was neither severe or pervasive. Cases rely or courts rely on Title VII interpreting Title IX cases, and so we would argue that it was. Are there cases where, I mean, they did do something. They told them not to work near each other. Apparently, was that passed by Ms. Massabi before that, I don't know if you would call it a punishment or a restriction, was handed down? Was that passed by her? Because she seemed to not understand that, and so it's a little disconcerting that the school took certain actions but wouldn't have necessarily reported that back to her so that she could understand what the lay of the land was. I think that Ms. Massabi's evidence on that particular issue is a little contradictory in that there is an e-mail where she says affirmatively, my supervisors have ensured that I do not have to work with this person, I don't have to attend a staff meeting, and later, subsequently, she says, I didn't know he was still working here or permitted to do it. So in that way, we believe it was contradictory because previously she had acknowledged. So she had an understanding that something had been taken. It sounds like there might have been a misunderstanding as to what action had been taken. Finally, I guess you are the one to ask the question, too, of if we don't, and again, that's hypothetical, I don't know what we're going to do, but if we said that the jury trial were to stand, is there anything we can do on the front end? I mean, can we say, hey, a jury found that there was no assault here, but we think that the investigation was improperly handled? I would only argue, Your Honor, respectfully reiterate that the standard on Title IX, it's of deliberate indifference, very high. It requires more than just laziness, carelessness. If there is some sort of imprudence after the fact, that's insufficient to find deliberate indifference. Thank you. I just want to clarify a couple of things. I was focused on the bear hug because, to me, you didn't have to go further than that, but Mr. Brown did go further than that, and he did hold up Ms. Massavi against a wall. He did digitally enter into her vagina. But that's when you do run into the trial, but I want to know what exactly is your understanding of the evidence about the bear hug? My understanding of the evidence that's there is that, in terms of the bear hug issue, is that there's no contradiction between the two people on that issue. I know. I want to know exactly what that is. What is it? What is the evidence? What's the issue? What's the evidence? No. What's the evidence? You said there was no contradiction. What is the evidence as you understand it exactly? And that's what Lorraine Jones said. That's what the investigator for the college said because she said, you know, both of them say it was non-consensual. Both of them say that it was imposed on her and that she was restrained. And Jones found that? Yeah, she did. That's like right up front. That's like in the first days of the investigation. And it just the fact that there wasn't that that wasn't a sufficient finding. And I think there's case law that says, yeah, a hug can trigger one of these issues. There's a case that we cite of a female boss who asked everybody to hug her to get her paycheck, and of a city official who was removed right away from the workplace where he was charged with sexual harassment from a hug. Okay. To stop it from continuing. Okay. We understand your position. We will review the record very carefully. Thank you. Thank you. Thank both counsel for their arguments. The case just argued is submitted.
judges: Schroeder, Berzon, Nelson